07-2949-cv
In Re: Parmalat Securities Litigation v.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: November 29, 2007    Decided:        July 22, 2008)

Docket No. 07-2949-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ENRICO BONDI, EXTRAORDINARY COMMISSIONER OF PARMALAT
FINANZIARIA S.P.A. AND PARMALAT S.P.A., A/K/A NEW PARMALAT,
AND OTHER AFFILIATED ENTITIES, IN EXTRAORDINARY
ADMINISTRATION UNDER THE LAWS OF ITALY,

Appellants,

RENATO ESPOSITO, FONDAZIONE ITALO MONZINO, SOUTHERN ALASKA
CARPENTERS PENSION FUND, CRISTINA PONCIBO, MARGERY LOUISE
KRONENGOLD, ROBERT MCQUEEN, CUSTODIAN, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY SITUATED, FERRI GIAMPOLO,
FOOD HOLDINGS LIMITED, DAIRY HOLDINGS LIMITED, G. JAMES
CLEAVER, GORDON I. MACRAE, GERALD K. SMITH, LAURA J.
STURAITIS, MONUMENTAL LIFE INSURANCE COMPANY, TRANSAMERICA
OCCIDENTAL LIFE INSURANCE COMPANY, TRANSAMERICA LIFE
INSURANCE COMPANY, AVIVA LIFE INSURANCE COMPANY, PRINCIPAL
GLOBAL INVESTORS, LLC, PRINCIPAL LIFE INSURANCE COMPANY,
SCOTTISH RE {US} INC., PARMALAT CAPITAL FINANCE LIMITED,
HARTFOLD LIFE INSURANCE COMPANY, G. PETER PAPPAS, PLAN
ADMINISTRATOR AND ERSTE SPARINVEST KAPITALANLAGEGESELLSCHAFT
M.B.H.,

Plaintiffs,

- v.-

CAPITAL & FINANCE ASSET MANAGEMENT S.A., CATTOLICA
PARTECIPAZIONI S.P.A., HERMES FOCUS ASSET MANAGEMENT EUROPE
LIMITED, SOLOTRAT, SOCIETE MODERNE DES TERRASSEMENTS
PARISIENS,

Plaintiffs-Appellees,

BONLAT FINANCING CORPORATION, CALISTO TANZI, FAUSTO TONNA, COLONIALE S.P.A., CITIGROUP INC., BUCONERO, LLC, ZINNI & ASSOCIATES, P.C., DELOITTE TOUCHE TOHMATSU, DELOITTE & TOUCHE S.P.A., A SOCIETA PER AZIONI UNDER THE LAWS OF ITALY, GRANT THORNTON S.P.A., A SOCIETA PER AZIONO UNDER THE LAWS OF ITALY NOW KNOWN AS ITALAUDIT, S.P.A., NOW KNOWN AS ITALAUDIT, S.P.A, ,, DEUTSCHE BANK AG, MORGAN STANLEY & CO., INCORPORATED, BANK OF AMERICA CORPORATION, JAMES E. COPELAND JR., PARMALAT FINANZIARIA S.P.A., STEFANO TANZI, LUCIANO DEL SOLDATO, DOMENICO BARILI, FRANCESCO GIUFFREDI, GIOVANNI TANZI, DELOITTE & TOUCHE USA, LLP., DELOITTE & TOUCHE L.L.P., CREDIT SUISSE FIRST BOSTON, BANC OF AMERICA SECURITIES LIMITED, BANK OF AMERICA, N.A., CITIBANK, EUREKA SECURITISATION PLC, VIALATTEA LLC, PAVIA E ANSALDO, BANCA NAZIONALE DEL LAVORO S.P.A., CITIBANK, N.A., MARIA MARTELLINI, PROFESSOR, BANCA INTESA S.P.A., BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSOCIATION, BANC OF AMERICA SECURITIES, LLC, BANK OF AMERICA INTERNATIONAL, LTD., DELOITTE & TOUCHE TOHMATSU AUDITORES INDEPENDENT, CREDIT SUISSE INTERNATIONAL, CREDIT SUISSE SECURITIES LIMITED, CREDIT SUISSE, CREDIT SUISSE GROUP, GRANT THORNTON INTERNATIONAL AND GRANT THORNTON LLP,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Before:     JACOBS, Chief Judge, B.D. PARKER and
            WESLEY, Circuit Judges.

Appeal from an order of the United States District Court for the Southern District of New York (Kaplan, J.), denying the motion under 11 U.S.C. § 304 (repealed 2005) by a debtor in bankruptcy abroad to enjoin actions brought against it in the United States.

AFFIRMED. Judge Wesley dissents in a separate opinion.

KATHLEEN SULLIVAN (John B. Quinn, Peter E. Calamari, Loren Kieve, Terry L. Wit, Sanford I. Weisburst, Angela Nguyen, and William B. Adams, on the brief), Quinn Emanuel Urquhart Oliver & Hedges, LLP, New York, NY, for Appellants.

STUART M. GRANT (James J. Sabella, John C. Kairis, and Diane Zilka, on the brief), Grant & Eisenhofer P.A., New York, NY; Steven J. Toll, Lisa M. Mezzetti, Mark S. Willis, and Joshua S. Devore, on the brief, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, D.C.; Robert M. Roseman, Andrew D. Abramowitz, Daniel J. Mirarchi, and Rachel E. Kopp of counsel, Spector Roseman & Kodroff, PC, Philadelphia, PA, for Plaintiff-Appellees.

DENNIS JACOBS, Chief Judge:

This appeal is taken from an order of the United States District Court for the Southern District of New York (Kaplan, J.), denying the motion by a debtor in foreign bankruptcy proceedings to enjoin actions brought against it in the United States. In re Parmalat Sec. Litig., 493 F. Supp. 2d 723 (S.D.N.Y. 2007). The debtor is the entity that emerged from Parmalat's Italian bankruptcy proceedings. Because the district court acted within its sound discretion, we affirm.

3

## **Background**

Following its financial implosion in the wake of a colossal fraud, Parmalat Finanziaria, S.p.A. and several of its subsidiaries and affiliates ("Old Parmalat") filed for bankruptcy protection under Italy's newly-created Marzano law. The bankruptcy court in Parma (the "Parma Court") declared Old Parmalat insolvent, and Italy's Minister of Finance appointed appellant Dr. Enrico Bondi to serve as Extraordinary Commissioner of Old Parmalat's bankruptcy estate, a role analogous to Chapter 11 Trustee.

## **A**

Almost immediately after Old Parmalat filed for bankruptcy in Italy, purchasers of Old Parmalat's debt and equity securities (the "Securities Fraud Plaintiffs") filed securities fraud class action lawsuits in the United States (the "Securities Fraud Actions") against Old Parmalat and against various banks and auditing firms that had allegedly participated in the fraud. Among the defendants were Grant Thornton International ("GTI") and Grant Thornton, LLP (collectively "GT").

In June 2004, Dr. Bondi, in his capacity as

Extraordinary Commissioner of the Old Parmalat bankruptcy estate, petitioned the Southern District of New York Bankruptcy Court to enjoin actions against the Old Parmalat estate with respect to any property involved in its Italian bankruptcy proceedings pursuant to § 304 of the Bankruptcy Code, 11 U.S.C. § 304 (repealed 2005). Section 304 permitted a representative of a foreign bankruptcy estate to commence a bankruptcy case in the United States in order to enjoin litigation against the foreign debtor in U.S. courts.[1] It instructed courts to fashion relief "guided by what will best assure an economical and expeditious administration" of the foreign bankruptcy estate consistent with, <u>inter alia</u>, "just treatment of all" holders of claims against the estate, and "comity." 11 U.S.C. § 304(c). The bankruptcy court entered a preliminary injunction shielding Old Parmalat from American lawsuits ("§ 304 Injunction"), and the Securities Fraud Plaintiffs dropped Old Parmalat as a defendant.

Once the § 304 Injunction was in place, Old Parmalat went on the offensive in United States courts. Among other

---

[1] Though § 304 was repealed, it remains applicable to this case. <u>See</u> Pub. L. 109-8 (enacting Chapter 15 of the Bankruptcy Code and repealing 11 U.S.C. § 304 for all ancillary petitions filed after October 17, 2005).

initiatives, Old Parmalat sued GT for malpractice (the "Recovery Actions").

All the while, Old Parmalat's Italian bankruptcy proceedings continued. Pursuant to his duties as Extraordinary Commissioner, Dr. Bondi proposed a restructuring plan, the "Concordato," which became effective upon approval both by a majority of Old Parmalat's creditors and by the Parma Court.[2] Under the Concordato, the assets of the 16 companies that composed Old Parmalat were transferred to a newly formed entity, appellant Parmalat, S.p.A. ("New Parmalat"), of which Dr. Bondi is the CEO. In marked contrast to bankruptcy norms in the United States, New Parmalat assumed all of the legal <u>liabilities</u> of its predecessor companies. Under the Concordato,

> eligible unsecured creditors with a title
> and/or cause that predates the date when
> individual [Old Parmalat companies] were
> declared eligible for Extraordinary
> Administration Proceedings, including
> creditors whose claims were not included
> in the sum of liabilities but whose
> claims [are] later verified by a court

---

[2] Some creditors have appealed from the Italian bankruptcy court's approval of the Concordato. While these appeals do not delay implementation of the Concordato, they keep the Italian bankruptcy case open until the Italian appellate courts resolve the appeals.

decision that has become final and, therefore, can no longer be challenged ("Late-Filing Creditors")

are entitled to receive New Parmalat stock.  Concordato ¶ 7.3b.  "New Parmalat thus functions . . . as a claims administrator, converting approved [late-filed] claims against Old Parmalat into . . . equity interests in New Parmalat."  In re Parmalat Sec. Litig., 493 F. Supp. 2d at 727.  Liquidated claims are discharged upon receipt of New Parmalat equity.

After New Parmalat came into being, the district court permitted the Securities Fraud Plaintiffs to amend their complaint to join New Parmalat as a defendant in the Securities Fraud Actions "as the successor to Old Parmalat."  New Parmalat appealed on the mistaken premise that the district court's order was tantamount to denying New Parmalat § 304 protection against direct securities fraud claims.  But the district court explained that it had not yet considered whether to grant § 304 relief to New Parmalat because the court had never received a motion seeking that relief.  New Parmalat withdrew its appeal and moved in the district court to expand the existing § 304 Injunction to

7

bar the Securities Fraud Plaintiffs from bringing direct claims against New Parmalat (the "Expansion Motion").

While the Expansion Motion was pending, the district court granted another motion--this one brought by GTI and Bank of America, N.A.--to narrow the § 304 Injunction to permit certain parties (who were defendants in both the Recovery Actions and the Securities Fraud Action) to file third party contribution claims against New Parmalat based on Old Parmalat's securities fraud (the "Narrowing Order"). The Narrowing Order contained a special feature: to the extent that any judgment in favor of GTI, Bank of America, or any other third party plaintiff, exceeds what the third party plaintiff owes New Parmalat, enforcement of the contribution claims will be allowed only in Italy. In other words, while the third party plaintiffs can use American judgments to set off their liability to New Parmalat, they may collect no money from New Parmalat unless and until the Italian courts choose to enforce the American court's judgment. New Parmalat appealed, and we eventually affirmed. See In re Parmalat Sec. Litig., 240 F.App'x 916 (2d Cir. 2007).

**B**

While the appeal from the Narrowing Order was pending in this Court, the district court denied New Parmalat's Expansion Motion, a decision which effectively let the Securities Fraud Plaintiffs bring direct (in addition to contribution) claims against New Parmalat. In re Parmalat Sec. Litig., 493 F. Supp. 2d 723 ("Expansion Denial Order"). This is the order now on appeal.

In explaining the Expansion Denial Order, the district court referred to its Narrowing Order (then on appeal, and later affirmed, see infra), and the five considerations that drove its decision there: (1) that economical and expeditious administration of the Old Parmalat estate would best be served by liquidating liability in the United States, where relevant facts were already being litigated in the Securities Fraud Litigation; (2) that comity would be served because, while plaintiffs would be allowed to liquidate their claims in the United States, they would be enforced only in Italy, if at all; (3) that the Narrowing order does not unfairly advantage GT because its contribution claim will be permitted in some forum in any

event--if not in the United States, then in Italy; (4) that Dr. Bondi's equitable claim to § 304 protection is weakened by his affirmative Recovery Actions against Parmalat's auditors and banks in the American courts rather than in Italy; and (5) that settlement would be facilitated by having all potentially liable parties before the district court.

In denying the Expansion Motion, Judge Kaplan wrote that "[t]he same considerations weigh against Section 304 relief here." In re Parmalat Sec. Litig., 493 F. Supp. 2d at 739. Specifically, Judge Kaplan reasoned: since the Narrowing Order permitted GTI's contribution claims against New Parmalat, New Parmalat was already before the court to litigate its fault for the securities fraud; as to comity, the Italian courts would benefit from an American court's determination of New Parmalat's liability under American securities law (an issue the parties were already litigating), and "plaintiffs seek to liquidate their claims in the United States, but would seek to enforce any judgment only in Italy"; Dr. Bondi's claim to equitable relief was no stronger than it was at the time of the Narrowing Order; and denying § 304 relief would facilitate settlement. Id. The

district court concluded: "while denying Section 304 relief undoubtedly would impose some expense on New Parmalat, the Court is persuaded that the benefits in efficiency and expeditiousness outweigh the costs." Id.

In sum, when § 304 motion practice concluded, New Parmalat was subject both to contribution claims and to direct claims for securities fraud in the district court.

Shortly after the district court denied New Parmalat's Expansion Motion, we affirmed the Narrowing Order. In re Parmalat Sec. Litig., 240 F.App'x 916. We emphasized that "the district court's decision to leave the enforcement (or not) of any judgment against plaintiff-appellant to the Italian courts was a sufficient measure of deference and comity." Id. at 919.

## Discussion

We review the Expansion Denial Order for abuse of discretion, see id. at 918; accord Bank of New York v. Treco (In re Treco), 240 F.3d 148, 155 (2d Cir. 2001), mindful that courts enjoy "broad latitude in fashioning an appropriate remedy" under § 304, Koreag, Controle et

11

Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision, S.A.), 961 F.2d 341, 348 (2d Cir. 1992).

Subsection (c) of § 304 required that,

> In determining whether to grant [injunctive] relief . . . , the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with--
>
> (1) just treatment of all holders of claims against or interests in such estate;
>
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3) prevention of preferential or fraudulent dispositions of property of such estate;
>
> (4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
>
> (5) comity; and
>
> (6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 304(c) (repealed 2005). New Parmalat contends that the Expansion Denial Order violated § 304's instruction

12

to assure an economical and expeditious administration of the foreign estate, and that it was inconsistent with both "just treatment" of all claimholders and "comity".

# I

We cannot say categorically that allowing the American Securities Fraud Litigation to proceed before Judge Kaplan "will best assure an economical and expeditious administration of" the Old Parmalat bankruptcy estate. It depends. On one hand, American litigation costs can be exorbitant; on the other, it may cost New Parmalat less to litigate the Securities Fraud Litigation here and now, given the risk that the Securities Fraud Plaintiffs will bring their American claims in the Parma Court. The governing law is that of the United States, and the frauds alleged were conducted in English. If the Securities Fraud Action were to be litigated in Italy some time in the future, the Parma Court would confront a foreign legal and regulatory scheme to which (we are informed) there is no Italian analog, a large number of documents in a foreign language, and (no doubt) conflicting expert affidavits on what American

securities law requires. All that said, we cannot say with assurance that, if excluded from American courts, the Securities Fraud Plaintiffs would proceed in Italy at all.

So there are good reasons on either side of the proposition that granting the Expansion Motion would "best assure an economical and expeditious administration of" the Old Parmalat estate. The question is whether the district court abused its discretion in denying the Expansion Motion.

Of course, if we believed that the Parma Court would view the district court as lacking jurisdiction (and that the Parma Court would treat any American judgment as a nullity), then we would reverse. (Under that circumstance, we assume the district court would not have entered its order in the first place.) But, to our knowledge, the Parma Court has made no statement regarding the district court's jurisdiction to liquidate the Securities Fraud Actions.

**II**

New Parmalat contends that the Expansion Denial Order is inconsistent with "just treatment" of all claimholders, 11 U.S.C. § 304(c)(1), and "comity," id. § 304(c)(5).

14

New Parmalat emphasizes that its shareholders are all claimholders, and argues that the Expansion Denial Order thus treats other claimholders unjustly by imposing litigation costs on New Parmalat without any potential benefit.  But the detriment is the same as that suffered by shareholders in any company that is made the defendant of a legitimate lawsuit.  And it would do no injustice to other claimholders if the Securities Fraud Plaintiffs win a judgment, which--at the direction of the Parma Court--results in issuance of New Parmalat stock.  True, issuance of stock to the Securities Fraud Plaintiffs would dilute New Parmalat's equity, thus reducing the value of existing share holdings; but there is no cognizable injustice to one claimholder in the satisfaction of claims properly presented by another.

Appellants argue (as they did when appealing the Narrowing Order) that denying the Expansion Motion violates § 304's policy of "comity."  On New Parmalat's appeal from the Narrowing Order, we considered the nature of Parmalat's Italian bankruptcy proceedings and the Concordato, and we concluded that "to leave the enforcement (or not) of any judgment against plaintiff-appellant to the Italian courts

15

was a sufficient measure of deference and comity." In re Parmalat Sec. Litig., 240 F.App'x at 919. Since the Expansion Denial Order makes clear that the courts of Italy will decide whether or not to enforce any judgment that the Securities Fraud Plaintiffs win in their direct suits against New Parmalat, we adhere to the view that international comity is respected.

This appeal is distinguishable factually from New Parmalat's appeal of the Narrowing Order, but the differences do not compel a different result on comity grounds. The Narrowing Order allowed the defendants in Dr. Bondi's Recovery Action to assert counterclaims, and thus to set off any judgment Dr. Bondi might win against them, whereas the Expansion Denial Order opens New Parmalat to suit by parties unconnected to the Recovery Actions. In both cases, however, the orders are consistent with comity because no third party plaintiff would be permitted to collect on an American judgment without the Italian courts' approval.

Finally, the district court's order does not violate the dictate of Italian bankruptcy law that the bankruptcy court has exclusive jurisdiction to satisfy creditors' claims. The Securities Fraud Plaintiffs are not yet

16

creditors of New Parmalat.  Only if the Securities Fraud Plaintiffs prevail in district court will they become judgment creditors of New Parmalat; and, as creditors, they will be required to submit their claims to the Italian courts for enforcement.

**III**

New Parmalat complains that the district court considered two factors not properly a part of the § 304 analysis: settlement potential and Dr. Bondi's offensive litigation in the United States.

We are naturally inclined against judicial decisions calculated to force a defendant to settle.  See, e.g., In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 148 (2d Cir. 2001) (Jacobs, J., dissenting).  But it is hard to dispute the district court's idea that consolidating American securities claims before a single court would make it easier for the parties to settle their differences without a judicial determination of liability.  See In re Parmalat Sec. Litig., 493 F. Supp. 2d at 739 (Expansion Denial Order).  This may or may not be true.  Indeed, it is unclear whether the Concordato would allow for any such settlement at all.  But, in any event, since it is often

17

thought that settlement is more economical and expeditious than litigation, the district court acted within the bounds of its discretion in considering likelihood of settlement.

Finally, we see nothing improper about weighing Dr. Bondi's offensive litigation in the United States: it is incrementally harder for Dr. Bondi to contend that it is a hardship for him to be where he has chosen to come.

**IV**

In dissent, Judge Wesley states that it is imprudent to issue this opinion now because (in the parties' words) "the parties do not believe that a disposition of the appeal at this time would advance the interests of either party," and because (in Judge Wesley's words) "the relevance of this Court's resolution of the appeal is entirely dependent upon the outcome of the settlement approval process in the Southern District." We respectfully disagree for the following reasons:

First, the parties brought this controversy before us, and they have not moved to withdraw it. As the parties advise, this case is not moot--though no doubt it may become moot if left undecided long enough.

Second, we expect that our opinion will be of use to the parties--as well as other persons and entitles: (1) the

18

district judge may want to consider whether the case is properly before him as he decides whether to approve the proposed settlement, see Fed. R. Civ. P. 23(e); (2) the Italian courts--to which we owe a duty of comity unaffected by the stated desires of the parties, and which would decide whether to enforce the resulting judgment--may wish to know whether the case (and settlement) was properly before the district court; and (3) the class members, who must decide whether to object to the proposed settlement, see Fed. R. Civ. P. 23(e)(5), or possibly opt out of it, may want to know whether an American court could hear their case in the event they reject the settlement.

## **Conclusion**

We cannot say with certainty what effect the Expansion Denial Order may have on the economy and expeditiousness with which the Old Parmalat estate will be administered. But we cannot conclude that the district court abused its discretion on that score. And our review of the record satisfies us that Judge Kaplan did not act inconsistently with any of the six considerations mandated by § 304(c). New Parmalat's remaining arguments are meritless. The order of the district court is therefore affirmed.

19

WESLEY, *Circuit Judge*, dissenting:

This appeal has changed dramatically (post-oral argument) as a consequence of an executed settlement agreement now awaiting approval in the Southern District of New York. Because this intervening event has materially changed the nature of an appeal that is presently on the verge of resolution, the majority's affirmance strikes me as imprudent. Were it up to me, I would have voted to stay the appeal, while retaining our jurisdiction to revisit it, should the promise of final settlement not bear fruit. Even if I thought the majority's discussion of the merits prudent, however, I would not think it correct. I therefore respectfully dissent.

## I.

Counsel for Plaintiff-Appellants informed the Court, by letter dated May 1, 2008, of the possibility of an imminent settlement between the parties and, in light of that possibility, stated that "the parties jointly request that the Court refrain from issuing any decision on this appeal at this time."[1] Letter of Counsel for Plaintiff-Appellees of May 1, 2008. The letter went on to say that "[i]f the settlement is approved, the appeal will be withdrawn." *Id.* As subsequently revealed in the public press, the settlement agreement was ultimately executed, and now awaits the confirmation of the district court.[2]

---

[1] Counsel for Plaintiff-Appellees "request[ed] that th[e] letter be filed under seal and not be made available to the public," but no motion to file under seal was granted by the Court and the issue, at this stage, is apparently moot.

[2] The May 1 letter informed us only of the *prospect* of imminent settlement – *i.e.*, "that the parties [were] on the verge of reaching a settlement in this matter (subject to court approval)" – but the agreement was, shortly thereafter, executed and made public. *See* "Parmalat Settles U.S. Shareholder Suit," N.Y. Times, May 3, 2008, *available at* http://www.nytimes.com (visited July 21, 2008) (search for article title); *see also* Press Release, Parmalat, Settlement with "class"

The public announcement of a prospective settlement prompted this Court to solicit the views of the parties on the impact of that agreement upon the instant appeal.[3] By letter dated May 12, 2008 (and assertedly joined in by Defendant-Appellants), counsel for Plaintiff-Appellees stated that "[t]he parties do not believe that the appeal, at this juncture, has been mooted by reason of the execution of the settlement agreement." Letter of Counsel for Plaintiff-Appellees of May 12, 2008. It continued: "If the settlement is approved with finality, the appeal will be moot, but if the settlement is not approved, it will not become effective and the appeal would not be moot." *Id.* Finally, the letter stated that

> [t]he parties do not believe that a disposition of the appeal at this time would advance the interests of either party. Because the settlement is not conditioned on the result of the appeal, the disposition of the appeal will not permit either party to withdraw from or request modification of the settlement.

*Id.*

In short, the relevance of this Court's resolution of the appeal is entirely dependent upon the outcome of the settlement approval process in the Southern District.

**II.**

In its opinion below, the district court contemplated the possibility of settlement in conducting its § 304(c) analysis, concluding that "having the claims against New Parmalat before this Court along with the others alleged in the [third amended complaint] will aid the process of

_____

(May 2, 2008).

 [3] The order of this Court "directed [the parties] to submit a letter to the Court . . . advising us as to whether, in view of the reported settlement of the underlying litigation: (1) the issue on appeal has been mooted; and, (2) a disposition of the appeal would advance the present interests of either party." *In re Parmalat Sec. Litig.*, No. 07-2949, (2d Cir. May 5, 2008).

21

possibly settling this dispute." *In re Parmalat Sec. Litig.*, 493 F. Supp. 2d 723, 739 (S.D.N.Y. 2007). Defendant-Appellants argued that the district court's weighing of the possibility of settlement in its § 304(c) analysis constituted "legal error and an abuse of discretion." Appellants' Br. 41.

There was merit, in my view, to New Parmalat's position. After all, the possibility of settlement appears nowhere among the six enumerated factors that courts were directed to consider under § 304(c). Venturing beyond the specific considerations codified under § 304(c) may well have constituted an abuse of discretion.

Presumably, the district court thought that its consideration of the possibility of settlement was relevant to § 304(c)'s instruction that, "[i]n determining whether to grant relief . . . the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with" the § 304(c) factors. 11 U.S.C. § 304(c). But it is at best unclear whether the pressure upon New Parmalat to settle a suit arguably not properly before the district court in the first place would have helped or hindered the estate.

In any event, this is now "water under the bridge," for New Parmalat has executed the settlement agreement with Plaintiff-Appellees, and seeks the district court's approval of that agreement. As a result, New Parmalat's objections to the district court's jurisdiction over this parallel proceeding, and to the district court's consideration of the possibility of settlement, take on a quite different hue. Even if it was improper for the district court to consider the possibility of settlement in its § 304(c) analysis prior to the settlement agreement, New Parmalat is now hard pressed to maintain its former objections. After all, the decision to settle is one that New

22

Parmalat willingly undertook.

At the same time, the parties' ambivalence concerning the prospect of our now issuing an opinion counsels caution, in my view, regarding the scope of our intervention. Thus, were I in the majority, I would have held the appeal to revisit it in the event that the settlement does not materialize. I think it unwise for this Court to address the merits of the dispute when the parties appear to be eminently (and imminently) capable of resolving it themselves.

**III.**

Even in the absence of a pending resolution of this case, I could not concur in the majority's discussion of the merits. First, the majority accepts as true Plaintiff-Appellants' argument that "New Parmalat assumed all of the legal *liabilities* of its predecessor companies," Maj. at 6, a view that – despite being controverted by New Parmalat – is a question best left to the Parma Court. *Cf. In re Artimm, S.r.l.*, 278 B.R. 832, 837 (Bankr. C.D. Cal. 2002). Second, the majority overlooks – as did the district court below – a crucial distinction between Dr. Bondi's posture in the Recovery Actions that he initiated in American courts, and the direct securities actions filed against Bondi and New Parmalat, which he did not. Bondi's purely defensive involvement in the latter proceedings is unlike his offensive initiation of recovery suits on behalf of Old Parmalat.[4] Third, the majority presumes that the Italian courts will be poorly

---

[4] New Parmalat argues that Bondi's offensive litigation in his recovery suits and New Parmalat's defensive litigation here are different in yet another respect – in the way they are treated by Italian law. Under Italian law, says New Parmalat, "any court (Italian or foreign) outside the Italian Bankruptcy Court that liquidates or enforces claims against the estate will be deemed by the Italian Bankruptcy Court to be acting without jurisdiction, making its actions void." Appellants' Reply Br. 12. In contrast, they argue, Italian law provides an exception for "set-off" actions – perhaps including the compulsory counterclaims pressed by Grant Thornton

equipped to handle American securities fraud claims, but – like the district court before it – does not weigh this fact against a number of other factors relevant to Italian law under § 304(c)(2), (3), and (4), all of which counsel in favor of issuing an injunction.[5]

Fourth, although the majority is correct to note that any award in Plaintiff-Appellants' favor would ultimately need to be approved by the Parma Court, New Parmalat points out that just defending against Plaintiffs' claims here, aside from any potential costs of enforcement in

against Bondi in response to Bondi's Recovery Action – where the claims against the estate are brought by a third-party plaintiff creditor in response to the debtor's offensive suit. The exception would arguably not apply to the instant suit, however, where Plaintiffs' claims are original, rather than counterclaims to Bondi's Recovery Action.

[5]  Section 304(c)(2) requires consideration of the "protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding." 11 U.S.C. § 304(c)(2). Plaintiffs do not contest that "Italian bankruptcy law comports with U.S. notions of fundamental fairness as it provides for notice, claims processing, and distribution similar to that provided for under U.S. law." *Adinolfi v. Empire Marble & Granite, Inc.* (*In re Rosacometta, S.r.l*), 336 B.R. 557, 565 (Bankr. S.D. Fla. 2005). Furthermore, "the mere fact that [a creditor] would have to pursue his claim against [a debtor] in a foreign proceeding is not  sufficient prejudice to deny relief." *Schimmelpenninck v. Byrne (In re Schimmelpenninck*), 183 F.3d 347, 364 (5th Cir. 1999). Section 304(c)(2) supports injunctive relief.

Section 304(c)(3) requires consideration of the  "prevention of preferential or  fraudulent dispositions of property of such estate." 11 U.S.C. § 304(c)(3). Plaintiffs do not contest that "Italian insolvency law proscribes both preferential and fraudulent transfers." *In re Rosacometta, S.r.l*, 336 B.R. at 565. Section 304(c)(3) supports injunctive relief.

Section 304(c)(4) instructs the court contemplating § 304 relief to consider whether the foreign bankruptcy proceeding will undertake "distribution of proceeds of such estate substantially in accordance with the order prescribed by this title." 11 U.S.C. § 304(c)(4). Plaintiffs do not contest that "the distribution of assets under Italian law is substantially in accordance with the order prescribed under United States law." *In re Artimm, S.r.l.*, 278 B.R. at 843. Section 304(c)(4) supports injunctive relief.

24

Parma, would impose its own set of costs, justifying deference on comity grounds.[6]  Without knowing the inner thoughts of New Parmalat and its counsel, we may speculate as to the role this concern may have played in its decision to settle with Plaintiffs.[7]  But whether it would have been *proper* for such pressures to impinge upon New Parmalat's decisionmaking (by virtue of the district court's denial of New Parmalat's requested § 304(c) relief) is quite another matter.

This Court, as well as Congress – through its adoption of the Private Securities Litigation Reform Act of 1995 ("PSLRA") – has taken note of the pressures upon corporate defendants to settle securities fraud "strike suits" when those settlements are driven, not by the merits of plaintiffs' claims, but by defendants' fears of potentially astronomical attorneys' fees arising from lengthy discovery.  *See, e.g.*, *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 171 (2d Cir. 2005) (Jacobs, J.) (noting "the congressional intent of the PSLRA 'to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries.'" (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000));

_____

[6] Indeed, one initial public report indicated that, pursuant to the pending settlement agreement, Parmalat agreed to issue 10.5 million shares, then valued at $36.8 million, to satisfy the class members' claims.  *Parmalat Settles Shareholder Lawsuit*, N.Y. L. J. May 5, 2008.  The full cost incurred by the estate did not include such transactional costs as, for example, notifying the members of the class of the settlement, an expense then estimated to be as much as $1.55 million.  *Id.*

[7] We need not speculate, however, on the reasons that Parmalat has itself offered for its decision to accept the settlement:  "Parmalat believes that this settlement is in the best interests of its shareholders to avoid the distraction and expense of further litigation, and diminishes uncertainty in the value of its stock."  Press Release, Parmalat, Settlement with "class" (May 2, 2008).  That uncertainty was, in part, the result of Plaintiffs' allegations of "the loss of billions of dollars by investors," (Third Am. Compl. ¶ 4) forming a class whose "exact number . . . [was] unknown to Plaintiffs at th[e] time" of the filing of the complaint, but which Plaintiffs estimated to number in the "thousands" (*id.* ¶ 1139).

25

*Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 98 (2d Cir. 2004) ("The PSLRA was intended to curtail 'strike suits'– *i.e.*, meritless class actions alleging fraud in the sale of securities. *See* H.R. Conf. Rep. No. 105-803 (1998)."). *See also Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 107 (2d Cir. 2001) (same).

Finally, while the views of the Italian Ministry of Economic Development (as made available to us in an amicus submission) are unquestionably relevant to the consideration of comity under § 304(c)(5), *cf. Bigio v. Coca-Cola Co.*, 448 F.3d 176, 178 (2d Cir. 2006) (reversing, in a non-§ 304 suit, the district court's dismissal of plaintiffs' suit on comity grounds, noting that, "[t]hroughout the long pendency of this lawsuit, the Government of Egypt has never raised the slightest objection to adjudication of the instant controversy by United States courts"), those views are never acknowledged by the majority. Despite its absence from the majority's opinion (as well as from the record below[8]), the amicus brief achieves added importance in light of the Ministry's role in both administering the Marzano Law and in approving Bondi's reorganization plan.

**IV.**

This Court's docket is awash with pressing matters vying for our attention. The majority has chosen to allocate already stressed judicial resources to an issue that is not similarly exigent, and despite the parties' express request that we hold our fire. It is arguable, I suppose, that the executed settlement agreement now awaiting approval confirms the wisdom of the district court's

---

[8] The district court cannot be faulted in this regard, for the amicus submission was not before that court.

decision. But such an inference would overlook the fact – well known by those who practice in this field – that settlements are often struck, not because of the persuasiveness of plaintiffs' claims, but because the alternative (or even the possibility of the alternative) is too costly to contemplate.

Whether these same concerns animated New Parmalat's settlement decision is not something we can know for certain, but what is clear is that the ends of settlement, alone, cannot justify the means employed by the district court below. The statute at issue does not speak to the district court's inherent power to hear this case. It lays out a rule of judicial discretion that must be measured by restraint. In my view, the district court erred as a matter of law in adding a factor to its comity equation while overlooking important additional factors required by the statute. In issuing its majority opinion, this Court compounds the error done – by adding to its jurisprudence when neither necessity nor efficiency is served by it. I therefore respectfully dissent.